THE PHILADELPHIA, WILMINGTON, AND BALTIMORE RAIL·LOAD COMPANY, APPELLANTS, *v.* THE PHILADELPHIA AND HAVP E DE GRACE STEAM TOWBOAT COMPANY.

The jurisdiction of courts of admiralty in torts depends entirely on localit· , and this court have heretofore decided that it extends to places within the br dy of a county. The term "torts" includes wrongs suffered in consequence ·f the negligence or malfeasance of others, where the remedy at common law is by an action on the case.

Hence, where a railroad company employed contractors to build a bridge, and for that purpose to drive piles in a river, and, owing to the abandonment of the contract, the piles were left in the river, in such a condition as to injure a vessel when sailing on her course, the railroad company were responsible for the injury.

That the vessel so injured was prosecuting her voyage on Sunday, is no defence for the railroad company. The statute of Maryland and the cases upon this. point examined.

Where there was conflicting testimony in the court below upon the amount of damages sustained, and there was evidence to sustain the decree, this court will not reverse the decree merely upon a doubt created by conflicting testimony.

THIS was an appeal from the Circuit Court of the United States for the district of Maryland, sitting in admiralty.

It was a libel filed by one corporation against another corporation in the District Court of Maryland, under the circumstances stated in the opinion of the court. The District Court decreed in favor of the libellants, the appellees, and awarded damages to the amount of $7,000.36. The Circuit Court, on appeal, affirmed the decree, and the railroad company appealed to this court.

It was argued by *Mr. Schley* and *Mr. Donaldson* for the appellants, and by *Mr. Dobbin* for the appellees.

The counsel for the appellants made the following points:

1. That the District Court of the United States has no jurisdiction in a case like the present.

The cases show that "marine torts," over which courts of admiralty have jurisdiction, are trespasses done and committed on navigable waters, as in the case of a collision between two vessels; and a main ground on which such cases have been put is the power *in rem* possessed by those courts, but not by courts of common law.

The placing and leaving the pile in the bed of the Susquehanna, and within the body of a county, was a nuisance at common law, and the appellee's remedy was in the State courts, in an action on the case for particular damage caused by that nuisance. Indeed, the ordinary rules of an admiralty court in apportioning damages could not be made applicable to such a case.

The question is not one of mere locality. The subject matter itself is not within the admiralty jurisdiction; and it is believed that none of the decisions of this court have gone to an extent which would include it.

Conkling, 21, 24.

Thomas *v.* Lane, 2 Sumn., 9, 10.

Cutler *v.* Rae, 7 How., 737.

Schooner Tilton, 5 Mason, 465.

Waring *v.* Clark, 5 How., 467.

Angell on Tide Waters, 113.

Hancock *v.* York N. and B. R. W. Co., 70 E. C. L. Rep., 347.

Abbott on Shipping, 233.

9 Stat. at Large, 1851.

2. That the appellees could not recover in this case, because they were engaged in an unlawful act at the time when the accident occurred, which caused the injury complained of. The steamer Superior left her wharf at Havre de Grace, with a fleet of canal boats, on Sunday, the 11th May, 1856, and while engaged in towing the boats down the Susquehanna on that day, struck the pile which disabled her.

It is the law of Maryland, that no person whatever shall work or do any bodily labor, or willingly suffer any of his ser-

vants to do any manner of work or labor, on the Lord's day, works of necessity and charity excepted; and a penalty is prescribed for the breach of the law.

There is nothing in this provision inconsistent with any of the laws of the United States regulating commerce, and the Federal courts would therefore take notice of and conform to the law of the State.

Act of Assembly of Md., 1723, c. 16, sec. 10.

Bank of U. S. *v.* Owens, 2 Pet., 527.

Bosworth *v.* Inhabitants of Swansea, 10 Metc., **363.**

Robeson *v.* French, 12 Metc., 24.

Phillips *v.* Innes, 4 Clark and Fin., 234.

Smith on Contracts, 171.

3. That even if the appellees could in the present case recover in admiralty against any party, they still had no cause of action against the appellants; the act of negligence which caused the injury not having been the act of the appellants or of its servants.

The evidence shows that the Superior struck upon a sight-pile driven by the servants of Messrs. Goss, Cooke, & Co., who had contracted for a stipulated compensation to build the piles of the bridge across the Susquehanna.

By the second sentence of the 9th section of that contract, the contractors were "to furnish (and remove when done with) all scaffolding and piles that may be used while building;" which terms, according to the testimony of engineers and experts, included the sight-piles, which were necessary to the proper construction of the bridge. It was the duty of the contractors to remove these sight-piles when done with; and the act of the contractors, or of their servants, in sawing off those piles below the surface, and leaving them so as to obstruct the navigation, was in no sense the act of the appellant.

There is nothing to show that the appellant ever had knowledge of the fact that these piles were sawed off, instead of being removed, as the contract required; and the termination of the contract could not make the appellants liable for the consequences of a previous wrongful act of the contractors, the

appellants not consenting either to making or continuing the nuisance.

> Allen *v.* Hayward, 53 E. C. L., 974.
> Reedie *v.* London and N. W. R. W. Co., 4 W., H., and G., 244, 245.
> Knight *v.* Fox, 5 Exch., 721.
> Steel *v.* S. E. R. W. Co., 32 E. C. L., 366.
> Overton *v.* Freeman, 73 E. L. and E. Rep., 866.
> Peachey *v.* Rowland, 13 C. B., 182, (76 E. C. **L. Rep.**)
> Blake *v.* Ferris, 1 Seld., 48.
> Hilliard *v.* Richardson, 3 Gray, 354.
> Rapson *v.* Cubitt, 9 M. and W., 710.
> Milligan *v.* Wedge, 40 E. C. L., 177.
> Burgess *v.* Gray, 1 C. B., 578, (1 Man., Grang., and Scott.)

4. That the sinking of the Superior after striking upon the sight-pile was owing to the mismanagement of her captain, and the appellees cannot be entitled to recover the damages consequent upon her sinking, for the cost of raising her, or the loss of time while she was under water.

The testimony of a number of steamboat captains, and of persons well acquainted with the river near Havre de Grace, shows that the true course for the captain to have pursued, after the vessel struck, was to run her upon the flats indicated on the illustrative map by the letters C, B, D; and that if he had done so, she would not have sunk.

Even if there was no error in returning to the wharf, the evidence shows great want of care in the omission properly to secure the vessel to the wharf, and in other particulars.

5. That the amount of the decree is greater than the actual loss which naturally or necessarily resulted from the injury; and greater, indeed, than the total value of the injured boat.

*Mr. Dobbin,* for the appellees, made the following points:

1. That the steamer "Superior," the subject of the injury, being, at the time of the wrong committed, a licensed vessel, sailing in her lawful business, on waters within the ebb and flow of the tide, a court of admiralty has jurisdiction to redress

any trespass upon her, notwithstanding an action at law might have been maintained for the same injury.

3 Story on Con., 530.

2 Brown's Civil and Ad. Law, 110, **203.**

Thomas *v.* Lane, 2 Sumner, 9.

The Ruckers, 4 Rob. Ad. R., 73.

Steele *v.* Thatcher, Ware's Rep., 98.

Thackery *v.* the Farmer, Gilp. R., 529.

Waring *v.* Clark, 5 How., 464.

New Jersey S. B. Co. *v.* Merchants' Bank, **6 How., 431,** 432.

Manro *v.* Almieda, 10 Wheat., 473.

Plummer *v.* Webb, 4 Mason, 383.

Chamberlain *v.* Chandler, 3 Mason, 242.

Bees Ad. R., 369.

Angell on T. W., 119.

The Volant, 1 W. Robinson, 387.

Zouch, 117, 122.

Com. Dig. "Admiralty" E., 13.

Sir Leoline Jenkins, 2 Brown's C. and Ad. L., **475.**

De Lovio *v.* Boit, 2 Gall., 437.

Judge Winchester, 1 Pet. Ad. Dec., 234.

2. That the act of Assembly of Maryland did not contemplate a restraint on the sailing of vessels engaged in foreign commerce, or in the coasting trade, and that, if it did, such restraint is repugnant to the Constitution and laws of the United States; and that the "Superior," being a vessel duly enrolled and licensed, in the district of Philadelphia, for the coasting trade, had a right to pursue such trade without any restraint thereon by the laws of the State of Maryland, in respect to the time within which such coasting trade might be prosecuted.

Gibbons *v.* Ogden, 9 Wheat., 240.

Brown *v.* State of Maryland, 12 Wheat., **448.**

Brown *v.* Jones, 2 Gall., 477.

Willard *v.* Dorr, 3 Mason, 93.

3. That the railroad company, and not the contractors under them, are responsible for the injury:

First—because the whole work was done under the direction and superintendence of the company, the contractors undertaking to do only as directed by the company's engineers; and there being no proof that the contractors violated their instructions, the presumption is that all that was done was by order of the company's superintendent.

Second—because the pile upon which the steamer ran was not such an one as is contemplated by the contract, where it speaks of " scaffolding and piles that may be used while building," the proof being that this was one of a group erected away from the line of the bridge, for the exclusive use of the company's engineers employed in performing the duty of superintendence, which the company had reserved to itself.

Third—because, at the time of the accident, the company had discharged the contractors, and taken possession of all that was built of the bridge, in its then unfinished condition; and they are responsible for any damage which might arise from their leaving the work in a position to inflict injury upon vessels navigating the Susquehanna.

4. That the captain of the steamer exercised the utmost prudence, skill, and judgment, after the accident, as the record abundantly shows; but even if this were less apparent as a question of fact, it having undergone full examination in the District Court, and in the Circuit Court on appeal, this court will not disturb the decree, unless in a clear case of mistake.

Walsh *v.* Rogers, 13 How., 284.

5. That the sum decreed against the appellant is less than the proof shows to have resulted from the injury.

Williamson *v.* Barrett, 13 How., 110.

Mr. Justice GRIER delivered the opinion of the court.

A brief statement of the facts of this case will be sufficient to show the relevancy of the questions to be decided.

The appellants were authorized by a statute of Maryland to construct a railway bridge over the mouth of the Susquehanna river, at Havre de Grace. They entered into an agreement with certain contractors, to prepare the foundations and erect the piers. In pursuance of their contract, these persons drove

## DECEMBER TERM, 1859. 215

*Phila., Wil., and Balt. R. Co.* v. *Phil. and Havre de Grace Steam Towboat Co.*

piles into the channel of the river, under the direction of the engineers employed by the appellants. Before the completion of the contract, the appellants abandoned their purpose of building the bridge, and discharged the contractors. During the progress of the work, the contractors had driven certain piles, called sight-piles, into the channel of the river, which were not removed or cut off level with the bottom, but were cut a few feet under the surface of the water, so that they became a hidden and dangerous nuisance. The steamboat Superior, engaged in towing boats between Philadelphia and Havre de Grace, left a port in Maryland on Sunday morning, and soon after came into forcible collision with one or more of these piles; in consequence whereof she suffered great damage, and for which this libel was filed.

The appellants have, in this court, insisted chiefly on three points of defence to the charges of the libel:

I. It is contended that the "marine torts," over which courts of admiralty have jurisdiction, are trespasses done and committed with force on the sea and navigable waters, such as collision of vessels, assaults, &c., and that the placing and leaving the piles in the bed of the river, and within the body of a county, is a nuisance at common law, and the remedy of the appellees should have been by an action on the case.

The jurisdiction of courts of admiralty, in matters of contract, depends upon the nature and character of the contract; but in torts, it depends entirely on locality. If the wrongs be committed on the high seas, or within the ebb and flow of the tide, it has never been disputed that they come within the jurisdiction of that court. Even Lord Coke (4 Inst., 134) declares, "that of contracts, pleas, and *querels*, made upon the sea or any part thereof, which is not within any county, the admiral hath and ought to have jurisdiction."

Since the case of Waring v. Clark, (5 How., 464,) the exception of "*infra corpus comitatus*" is no longer allowed to prevail. In such cases, the party may have his remedy either in the common-law courts or in the admiralty. Nor is the definition of the term "*torts*," when used in reference to admiralty jurisdiction, confined to wrongs or injuries committed

by direct force. It includes, also, wrongs suffered in consequence of the negligence or malfeasance of others; where the remedy at common law is by an action on the case. It is a rule of maritime law, from the earliest times, "that if a ship run foul of an anchor left without a buoy, the person who placed it there shall respond in damages." (See Emerigon, vol. 1, page 417; Consulat de la Mer., chap. 243; and Cleirac, 70.)

In the resolution of the twelve judges, in 1632, it was determined in England, "that the courts of admiralty may inquire of and redress all annoyances and obstructions that are or may be any impediment to navigation, &c., and *injuries done there which concern navigation on the sea.*"

Hence, "the impinging on an anchor or other *injurious impediment negligently* left in the way," has always been considered as coming within the category of maritime torts, having their remedy in the courts of admiralty. (See 2 Brown Civ. and Adm., 203.)

The objection to the jurisdiction of the court is therefore not sustained.

II. The testimony showed that the injury to the steamer was caused by her coming in contact with one of the sight-piles, driven into the channel by the contractors, and left in the situation already stated.

This contract is set forth at length. It showed that the contractors were bound to "provide all necessary machinery, &c., and to furnish (and remove, when done with) all scaffolding and piles that may be used while building."

It is contended by the appellants that they are not liable for the negligence which caused this injury, because the piles were not placed in the channel by their servants, but by those of the contractors; and that the case was not altered by the fact that the contractors were directed to do so by the engineers, who were the servants of appellants.

If the contractors had proceeded to complete their contract, and left the piles in the condition complained of, this defence to the action might have availed the appellants. But as the driving the piles for the legitimate purpose of the erection was

by authority of the law and in pursuance of the contract, the contractors had done no wrong in placing them there. The nuisance was the result of the negligence in cutting off the piles, not at the bottom of the river, but a few feet under the surface of the water. This the contractors were bound to do, after the piles had served their legitimate purpose in the construction of the bridge, and after they had completed their contract. But before this, the railroad company determined to discontinue the erection of the bridge. They dismissed the contractors from the further fulfilment of their contract. Under such circumstances, it became the duty of the appellants to take care that all the obstructions to the navigation, which had been placed in the channel by their orders, and for the purpose of their intended erection, should be removed. The nuisance which resulted from leaving the piles in this dangerous condition was the consequence of their own negligence or that of their servants, and not of the contractors.

III. The appellants urge, as a further ground of defence, that this collision took place on Sunday, shortly after the steamboat had commenced her voyage from a wharf, "parcel of the territory of Harford county, in the State of Maryland; that the boat was used and employed by her owners in towing canal boats; and that, when entering on her voyage, those who had her control and management were engaged in their usual and ordinary work and labor—the same not being a work of necessity or charity—contrary to the laws of the State of Maryland."

A statute of Maryland forbids persons "to work or do any bodily labor, or to willingly suffer any of their servants to do any manner of work or labor, on the Lord's day—works of necessity and charity excepted;" and a penalty is prescribed for a breach of the law.

It has been urged, that there was nothing in this provision inconsistent with any of the laws regulating commerce, and that the Federal courts should therefore take notice of and conform to the laws of the State.

But assuming this proposition to be true, the inference from it will not follow as a legitimate conclusion; for, if we admit

that the master and mariner of a ship or steamboat are liable to the penalty of the act for commencing their voyage from a port in Maryland on Sunday, it by no means follows that the appellants can protect themselves from responding to the owners of the vessel for the damages suffered in consequence of the nuisance.

The law relating to the observance of Sunday defines a duty of a citizen to the State, and to the State only. For a breach of this duty he is liable to the fine or penalty imposed by the statute, and nothing more. Courts of justice have no power to add to this penalty the loss of a ship, by the tortious conduct of another, against whom the owner has committed no offence. It is true, that in England, after the statute of 29, ch. 2d, forbidding labor on the Lord's day, they have, by a course of decision perhaps too obsequiously followed in this country, undertaken to add to the penalty, by declaring void contracts made on that day; but this was only in case of executory contracts, which the courts were invoked to execute. It is true, that cases may be found in the State of Massachusetts, (see 10 Metcalf, 363, and 4 Cushing, 322,) which, on a superficial view, might seem to favor this doctrine of set-off in cases of tort. But those decisions depend on the peculiar legislation and customs of that State, more than on any general principles of justice or law. (See the case of Woodman *v.* Hubbard, 5 Foster, 67.)

We would refer, also, to a case very similar in its circumstances to the present, in the Supreme Court of Pennsylvania, in which this subject is very fully examined by the learned chief justice of that court; and we concur in his conclusion: "That we should work a confusion of relations, and lend a very doubtful assistance to morality, if we should allow one offender against the law, to the injury of another, to set off against the plaintiff that he too is a public offender." (See Mohney *v.* Cook, 26 Penn. Reps., 342.)

We do not feel justified, therefore, on any principles of justice, equity, or of public policy, in inflicting an additional penalty of seven thousand dollars on the libellants, by way of set-off, because their servants may have been subject

to a penalty of twenty shillings each for breach of the stat-ute.

Moreover, the steamboat in this case was sailing on a public river, within the ebb and flow of the tide; she had a coasting license, and was proceeding from a port in one State to a port in another.   Has it ever been decided that a vessel leaving a port on Sunday infringes the State laws with regard to the observance of that day?

We have shown, in an opinion delivered at this term, that in other Christian countries, where the observance of Sundays and other holidays is enforced by both Church and State, the sailing of vessels engaged in commerce, and even their lading and unlading, were classed among the works of necessity, which are excepted from the operation of such laws.   This may be said to be confirmed by the usage of all nations, so far, at least, as it concerns commencing a voyage on that day. Vessels engaged in commerce on the sea must take the ad-vantage of favorable winds and weather; and it is well known that sailors (for peculiar reasons of their own) give a prefer-ence to that day of the week over all others for commencing a voyage.

In the case of Ulary v. the Washington, (Crabbe, 208,) where a sailor justified his departure from a ship in port, be-cause he was compelled to work on Sunday, Judge Hopkin-son decided, "that, by the maritime law, sailors could not re-fuse to work on Sunday—the nature of the service requires that they should do so."

We have thus disposed of the questions of law raised in this case, and concur with the District and Circuit Court in their decision of them.

Some objections have been urged to the assessment of dam-ages, and their amount.

On this subject there was much contradictory testimony, as usually happens when experts are examined as to matters of professional opinion.   The judges of the courts where this question was tried can better judge of the relative value of such conflicting testimony, from their knowledge of places and per-sons, and they may examine witnesses *ore tenus*, if they see fit.

There was evidence to support the decree; and we can see no manifest error into which the court below has fallen. Appellants ought not to expect that this court will reverse a decree, merely upon a doubt created by conflicting testimony.

The judgment of the Circuit Court is affirmed, with costs.